Filed 4/3/14  P. v. Jackson CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>ERNEST JOSEPH JACKSON et al.,<br><br>　　Defendants and Appellants. | B242755<br><br>(Los Angeles County<br>Super. Ct. No. VA122085) |

APPEAL from judgments of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed in part, and remanded with instructions.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant Ernest Joseph Jackson.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant Richard Johnson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Ernest Joseph Jackson and Richard Johnson each appeal from a judgment and sentence, following their convictions for attempted premeditated murder, assault, mayhem and second degree robbery. Appellants contend there was insufficient evidence to support the convictions for attempted premeditated murder. Johnson separately contends the trial court erred by failing to give a heat-of-passion instruction sua sponte. Jackson separately contends the court erred in instructing the jury that it could draw adverse inferences from his testimony. Finding no prejudicial error, we affirm the convictions. Appellants also contend, and the People concede, that there were sentencing errors. We will, therefore, order the abstract of judgment amended to correct those errors.

# PROCEDURAL HISTORY

In an amended information, the Los Angeles County district attorney charged appellants and codefendant Onesi Reyes Howard with attempted willful, deliberate and premeditated murder of James Haley (Pen. Code, §§ 187, subd. (a), 664, count 1);[1] mayhem (§ 203, count 2); second degree robbery (§ 211, count 3); and assault by means likely to produce great bodily injury (§ 245, subd. (a)(1), count 4). As to counts 1, 2, and 3, the information alleged that Jackson and Howard personally used a deadly weapon (§ 12022, subd. (b)(1)). As to all counts, the information alleged that appellants and Howard personally inflicted great bodily injury (§ 12022.7, subd. (a)). It was further alleged that appellant Johnson had suffered one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), one prior serious felony conviction (§ 667, subd. (a)(1)), and had served two prior prison terms (§ 667.5, subd. (b)). It was also alleged that Jackson had served

---

[1] All further statutory citations are to the Penal Code.

one prior prison term. (§ 667.5, subd. (b).) Appellants pled not guilty and denied the special allegations.

A jury found appellants guilty as charged and found all of the special allegations to be true.[2] In a bifurcated proceeding, appellants admitted all the prior convictions allegations, and the trial court struck the prior prison term allegations as to Johnson.

The court sentenced Johnson to 22 years to life in prison on count 1, and to a concurrent term of three years on count 3. It imposed and stayed sentences on counts 2 and 4. Johnson received 268 days of actual custody credit and 0 days of conduct credit, for a total of 268 days of presentence custody credit.

The court sentenced Jackson to 12 years to life in prison on count 1, and to a concurrent term of three years on count 3. The court imposed and stayed sentences on counts 2 and 4. Jackson received 266 days of actual custody credit and 0 days of conduct credit, for a total of 266 days of presentence custody credit.

Appellants filed timely notices of appeal.[3]

## FACTUAL BACKGROUND

A.    *The Prosecution Case*

James Haley was a friend of appellants and of Howard, who was Johnson's girlfriend. They would spend time together several days a week. On the afternoon of September 24, 2011, Haley and Jackson were sitting on a bench in Washington Park. Nearby was Haley's shopping cart, containing some food, clothing, a

---

[2]    The jury acquitted Howard on count one, and convicted her on counts two through four.

[3]    Howard was sentenced to four years in state prison. She filed an appeal, but later abandoned it.

boombox stereo and two five-foot broom handles. Johnson and Howard arrived and sat down on a nearby bench. Jackson then shouted to Johnson that Haley "keeps saying he's sleeping with your girlfriend." This rumor had started two or three months before, but Haley had never discussed it with Johnson or Howard.

After Jackson spoke, Johnson, appearing angry, jumped up from his bench and started toward Haley. As Haley stood and tried to "get around" Johnson, Jackson hit him on the back of the head with one of the broom handles. Johnson then put Haley in a chokehold and told Howard to check Haley's pockets. Howard took five dollars out of Haley's front right pants pocket. Johnson let Haley go, and all three then began beating Haley. They kicked Haley in the face, chest, back, side, and throat. Haley began to see flashes of light. Haley estimated that Johnson kicked him about 10 times, Jackson over 20 times, and Howard three or four times. After Howard kicked Haley, she grabbed the other broom handle and began hitting him with it.

Haley begged them to stop, but they continued. "I kept asking [Johnson] why is he doing this," but he did not respond. Instead, "he just continued to kick and beat me." At one point, Johnson shouted, "Kill him. Kill him." Haley lost consciousness. When he came to briefly, appellants started beating him again. Before Haley lost consciousness again, he heard voices discussing calling an ambulance.

When Haley woke up, he was in the hospital. He could not see or speak. He stayed in the hospital nearly two weeks. The assault left Haley with severe injuries. Before the beating, he did not need glasses, but at the time of trial, he was blind in his right eye and could see only shapes out of his left eye. Likewise, before the beating, Haley had a straight jaw. After the beating, his reconstructed jaw was crooked, he could eat only soft food, and he could not eat anything using

4

the left side of his mouth. Additionally, after the beating, Haley lost hearing in his left ear for a month. Haley thought the attack had been planned because "the day before there wasn't [any] problem."

On cross-examination, Haley admitted he had smoked PCP the day before the incident, but asserted he was not under the influence when he was beaten. He also admitted he had been convicted of a felony in 1982.

Firefighter and paramedic Jeremy Collings testified that when he arrived at the scene at 4:22 p.m., Haley was lying unresponsive on the grass, with blood on his face. Collings treated Haley using general trauma procedures before Haley was taken to the hospital.

Los Angeles County Sheriff's Deputy John Schoen arrived while Haley was being treated. Deputy Schoen interviewed Jackson and Howard who were nearby. Jackson told Deputy Schoen that he had found Haley in that condition, and that Haley had asked him to call an ambulance. Howard told Deputy Schoen she did not see or hear anything. Jackson and Howard showed no signs of injuries, and they did not seem concerned about Haley. Deputy Schoen also saw a shopping cart and a broom handle nearby.

Detective Jonathan Stambook with the Los Angeles County Sheriff's Department interviewed Haley at the hospital on October 3, 2011. Although Haley could not see, he identified his attackers by name. Later, on October 11, 2011, Haley identified appellants and Howard from six-packs of photographs.

As part of his investigation, Detective Stambook examined the crime scene the day after the incident. He found bloodstains on the grass and on a nearby low wall.

Dr. Joseph McQuirter, an oral maxillofacial surgeon, treated Haley a few days after the attack. Haley had numerous facial fractures on both the left and

5

right sides of his face. His jaw was lower on the left side than the right side because its structural support had been fractured. Dr. McQuirter placed eight bone plates inside Haley's face to rebuild the structural integrity. He also straightened out a deviation in Haley's nasal septum. The surgery lasted nearly six hours.

Dr. McQuirter noted that a fairly concentrated blow was required to break the cheekbone. Similarly, the jawbone fractures indicated a "high impact blow." It was unlikely that the injuries were caused by blows to the face from fists alone, or by the impact from falling down. Left untreated, the injuries were life threatening.

B. *The Defense Cases*

Both appellants testified in their defense. According to Johnson, he was looking for Howard when he saw Haley sitting on a park bench. Johnson asked Haley if he had seen Howard. Haley did not respond, but looked at Johnson as if he were mad at him. Johnson asked, "'What's wrong with you?'" Haley responded by asking if he was Howard's "keeper." Johnson said, "'What's up with you, man? You tripping, man.'" It appeared to Johnson that Haley was under the influence of PCP.

Haley got up and charged at Johnson. Johnson dodged, and Haley ran into the bench behind Johnson. Haley fell to the ground, but got up again and said he wanted to fight. Haley's face was swollen and he had a "knot" on his face near his left eye. There was some blood on his face.

Haley punched Johnson in the nose. Johnson punched back with both fists, and Haley fell down. Johnson denied hitting Haley with a stick, putting him in a chokehold, or robbing him. Johnson claimed he was acting in self-defense, and denied intending to kill or permanently disfigure Haley.

6

Johnson stated that Howard and Jackson were not present during the fight. Johnson saw them later, after the ambulance arrived. When the sheriff's deputies arrived, Johnson did not approach because he was afraid of being blamed. When Johnson was interviewed by the police two days after the attack, he did not tell them the truth. Johnson admitted he previously had been convicted of crimes of moral turpitude in 1999 and 2001. He stated that he probably would not have gotten mad if he had heard the rumor that Haley had slept with Howard. Johnson also conceded that he could have walked away after Haley fell to ground the first time.

Jackson testified that he was sitting on a park bench when he heard Johnson and Haley fighting. Jackson was about 30 to 40 feet away, and he could not hear their exact words. Jackson turned around to watch them, and he witnessed the fight. He saw Haley take a swing at Johnson, Johnson punch back, and the two men get into a "rumble." Haley then tried to "go under" Johnson, but missed when Johnson moved out of the way. Haley then hit the park bench, and fell to the ground. He was on his knees, and he asked Jackson to call 911.

Jackson did not try to stop the fight because he did not want to get involved. When the fight was over, Jackson called 911 from a pay phone located in a nearby train station. When Jackson returned to the scene of the fight, Haley was lying on the ground and the paramedics already had arrived. Jackson spoke to Deputy Schoen even though he knew he was likely to be arrested for a preexisting parole violation, because he cared more about getting Haley help than about the possibility of being arrested. Jackson did not tell Deputy Schoen that he had seen the fight because he was raised not to snitch.

Jackson denied hitting Haley with his fists or a broom handle. He stated that Haley was not robbed. Jackson also denied instigating the fight by telling Johnson

7

about the rumor that Haley had slept with Howard. He had never heard about the rumor, and if there had been such a rumor, it was probably Haley who started it. At trial, Jackson was angry that Haley accused him of attacking him when Jackson tried to help him. Jackson admitted being better friends with Johnson and Howard than with Haley. He also admitted he was convicted of felony theft in 2006, and of felony burglary in 2010.

Howard testified that she and Johnson had been bringing food to Haley every night for a year prior to the attack. On the day of the incident Howard did not see Haley until he was already lying on the ground being treated by paramedics. Howard denied hitting or kicking Haley, robbing him, or attempting to kill him.

### C.    *Rebuttal Testimony*

Sheriff's Deputy Fabian Salazar testified he interviewed Johnson and Howard a few days after the incident. Johnson showed no signs of injuries. Deputy Salazar asked Johnson if he had been in a fight with Haley. Johnson denied fighting Haley, although he saw the paramedics treating him. Howard told Deputy Fabian that she did not know who fought with Haley, but stated that it was not Johnson.

Deputy Stambook interviewed Jackson on October 27, 2011. Jackson said that he was a few feet away when Haley and Johnson got into a fight, and that Johnson struck Haley multiple times around the face. Jackson did not say that Haley punched Johnson first, that Haley ran or charged at Johnson, or that Haley hit a park bench. Jackson never said Haley asked him to call 911; he made the decision to call 911 on his own. Detective Stambook also investigated the 911 call

8

regarding Haley. There was only one call, and the caller sounded to the detective like a Hispanic male.

D.    *Surrebuttal Testimony*

The recording of the 911 call was played for the jury for the sole purpose of determining whether the caller had a Latino accent.

## DISCUSSION

Appellants contend there was insufficient evidence to prove the attempted murder was willful, premeditated and deliberate. Johnson separately contends the trial court should have instructed the jury sua sponte on the heat-of-passion theory of attempted manslaughter. Jackson separately contends the court should not have instructed the jury with CALJIC No. 2.62, the adverse inference instruction. Finally, both appellants contend they are entitled to additional days of presentence custody credits.

A.    *Sufficiency of the Evidence to Show Premeditation and Deliberation*

"In determining whether the evidence is sufficient to support a conviction or an enhancement, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and

9

of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.)

A defendant may be convicted of attempted murder when he forms a specific intent to kill and commits a direct but ineffectual act toward accomplishing the intended killing. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) Attempted murder is not divided into different degrees; attempted premeditated murder and attempted unpremeditated murder are not separate offenses. (*People v. Favor* (2012) 54 Cal.4th 868, 876.) However, once a jury convicts a defendant of attempted murder, it may then make a specific finding whether the murder was willful, deliberate and premeditated. (*People v. Douglas* (1990) 220 Cal.App.3d 544, 550.) Here, the jury convicted appellants of attempted murder, and separately found that the murder was willful, deliberate and premeditated. Appellants contend there was insufficient evidence in the record to support this finding. We disagree.

"""Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]""" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) In determining whether the evidence presented at trial could sustain a finding of deliberation and premeditation, courts generally examine evidence relating to motive, planning and manner of killing. A reviewing court need not accord any of

these categories of evidence any particular weight, and the court is not limited to these categories of evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1183.)

Here, the evidence suggested that Johnson had a motive to kill Haley because of the rumor, possibly started by Haley, that he had been sleeping with Johnson's girlfriend, Howard. Jackson had the motive to assist in the killing because he was a good friend of Johnson and Howard.

The evidence also shows planning, as the assault, as described by Haley, was a coordinated attack. Jackson triggered the fight by repeating a months-old rumor that Haley had been sleeping with Howard. Johnson confronted Haley, and when Haley stood to face Johnson, Jackson hit him in the back of the head with a broom handle. Such coordination supports the inference of a preconceived plan to attack Haley.

Finally, the manner of the assault also supported a finding of premeditation. When Haley fell after being hit by Jackson, appellants could have walked away. However, they continued to rain repeated and potentially lethal blows on Haley's head and face. Impervious to Haley's pleas that they stop, appellants continued to kick and hit Haley with broom handles, while Johnson yelled, "Kill him. Kill him." After beating Haley senseless, rather then walking away, they remained until Haley regained consciousness, whereupon they resumed their assault. Johnson kicked Haley about 10 times, and Jackson kicked him over 20 times. The duration of the assault, and the fact that appellants declined to walk away on at least two distinct occasions, support the jury's finding that the attempted murder was willful, deliberate and premeditated. (See *People v. Solomon* (2010) 49 Cal.4th 792, 829 [finding of premeditation and deliberation can be based upon nature of crime]; see also *People v. Bonillas* (1989) 48 Cal.3d 757, 792 ["Ligature strangulation is in its nature a deliberate act"]; *People v. Proctor* (1992) 4 Cal.4th

11

499, 529 [after binding the victim, defendant had a significant period in which to contemplate and plan her eventual death].)

 

B.     *Duty to Instruct Sua Sponte on Heat-of-Passion Theory of Manslaughter*

Johnson contends the trial court erred by failing to instruct the jury, sua sponte, on the heat-of-passion theory of attempted manslaughter. We disagree.

The trial court instructed the jury on attempted premeditated murder as follows: "If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was a result of deliberation and premeditation, so that it must have been formed upon preexisting reflection, and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is an attempt to commit willful, deliberate and premeditated murder." Appellants did not request -- and the court did not provide -- a separate instruction on the heat-of-passion theory of attempted manslaughter.

"'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 866.) However, the court is not required to give an instruction on the heat-of-passion theory of voluntary manslaughter (or attempted voluntary manslaughter) where there is a lack of "substantial evidence that defendant acted while under 'the actual influence of a strong passion' [citation] in response to legally sufficient provocation, such as caused him to '"act rashly or without due deliberation and reflection, and from this passion rather than from judgment"' [citation]." (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

12

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.)

Here, the heat-of-passion theory of attempted manslaughter was not supported by substantial evidence. Johnson testified that he acted in self-defense, not in reaction to a rumor that Haley had slept with Howard, and that hearing such a rumor would not have upset him. According to Johnson, he dodged Haley's attempted charge and after Haley hit him in the nose, retaliated by *throwing* only enough punches to knock Haley to the ground. Thus, subjectively, Johnson was not under the influence of a jealous rage or passion when he defended himself. (See *People v. Moye, supra,* 47 Cal.4th at pp. 554-555 [insufficient evidence to support heat-of-passion theory of manslaughter where defendant testified he acted deliberately in defending himself from each successive advance by the victim who, defendant claimed, attacked him].) Moreover, no objectively reasonable person would have been so aroused by such a rumor that he would have kicked, punched and assaulted Haley repeatedly until he lost consciousness. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1173, 1216 [evidence that defendant was intoxicated and jealous and that his girlfriend had threatened to "'put a butcher knife in your ass'" if he fell asleep on couch was legally insufficient to support heat-of-passion instruction]; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 ["*passion for revenge . . .* will not serve to reduce murder to manslaughter"].) Accordingly,

the trial court did not err in failing to instruct the jury, sua sponte, on the heat-of-passion theory of manslaughter.[4]

C.      *Instruction on Adverse Inferences from Jackson's Testimony*

""""It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.""" (*People v. Breverman* (1998) 19 Cal.4th 142, 154)  The California Supreme Court has ruled "that CALJIC No. 2.62 suffers no constitutional or other infirmity, and may be given in an appropriate case." (*People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*).)

Here, the record shows that counsel submitted a list of instructions on which they agreed, and a list of those on which they disagreed.  As CALJIC No. 2.62 was not in the latter list, it is presumed that the parties agreed to that instruction. Accordingly, the trial court instructed the jury with CALJIC No. 2.62 as follows:

> "In this case defendant has testified to certain matters.  If you find that a defendant failed to explain or deny any evidence against him or her introduced by the prosecution which he or she can reasonably be expected to deny or explain because of facts within his or her knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence

---

[4]      Jackson joined in Johnson's argument, but did not separately raise the issue or argue how it applied to him.  Even were we to consider the argument as to Jackson, there was even less evidence to support a heat-of-passion theory as to him.  Jackson testified he never fought or attacked Haley, and there was no evidence that Haley taunted, threatened or attacked Jackson.

In supplemental briefing, appellants argue that the recent case of *People v. Thomas* (2013) 218 Cal.App.4th 630 supports their contention that the error in failing to instruct the jury on a heat-of-passion theory of attempted manslaughter is subject to the harmless-error analysis set forth in *Chapman v. California* (1967) 386 U.S. 18, not the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836-837.  We need not address this issue, as we have determined there was no error.

14

and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable.

"The failure of a defendant to deny or explain evidence against him or her does . . . not by itself[,] warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt. If a defendant does not have the knowledge that he or she would need to deny or to explain evidence against him or her, it would be unreasonable to draw an inference unfavorable to him or her because of his or her failure to deny or explain this evidence."

As an initial matter, because defense counsel did not object -- and apparently agreed -- to the instruction, Jackson has forfeited this argument. (*People v. Battle* (2011) 198 Cal.App.4th 50, 64-65 [failure to object to instruction forfeits issue on appeal unless instruction affected defendant's substantial rights].) Even were we to find the argument not forfeited, Jackson has failed to show prejudice. His only argument concerning prejudice -- that CALJIC No. 2.62 improperly shifted the burden of proof -- was, as he concedes, squarely rejected by the California Supreme Court in *Saddler*. (See *Saddler*, *supra*, 24 Cal.3d at pp. 679-680 [CALJIC No. 2.62 does not reverse or lighten the prosecution's burden to prove every essential element of the crime beyond a reasonable doubt].)

Moreover, any error in giving the instruction was harmless. The prosecutor never referred to the instruction or argued that adverse inferences should be drawn from Jackson's testimony. Nor can we ascertain an adverse inference a jury could have drawn that would have resulted in a more favorable outcome, especially in light of Haley's identification of Jackson as one of his assailants. (See *People v. Boyer* (2006) 38 Cal.4th 412, 480 ["Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime. [Citation.]"].)

15

D.     *Sentencing Errors*

Jackson and Johnson contend they are each entitled to additional days of credit for presentence custody.  The People agree, and request that this court correct the sentence to award Jackson 39 additional days of custody credit and Johnson 40 days.  (*People v. Guillen* (1994) 25 Cal.App.4th 756, 764.)  Accordingly, we will order the abstract of judgment corrected to reflect that Jackson is entitled to a total of 305 days of presentence custody credit, and that Johnson is entitled to 308 days of presentence custody credit.

The People also agree with Jackson that his abstract of judgment is erroneous, and request this court to order the abstract of judgment corrected to remove the check mark next to "25 years to Life."  (*People v. Jones* (2012) 54 Cal.4th 1, 89.)  Accordingly, we will order the abstract of judgment modified to remove the check mark next to "25 years to Life."

Jackson also seeks to correct the abstract of judgment to show that he was sentenced to "straight life with a minimum parole eligibility of seven years" on count 1, instead of the "seven years to Life on count[] 1" noted on the current abstract of judgment.  Jackson concedes that the minimum parole eligibility on a straight life sentence is seven years, and the language of the abstract accurately reflects the trial court's oral pronouncement.  Absent a showing of prejudice, we decline to modify the language.

## DISPOSITION

The matter is remanded with directions to the superior court to:  (1) modify the judgment for appellant Jackson to reflect that he earned 305 days of actual presentence custody credit, and to remove the check mark next to "25 years to Life"; and (2) modify the judgment for appellant Johnson to reflect that he earned 308 days of actual presentence custody credit.  The judgments are affirmed in all

16

other respects.  The superior court is directed to prepare the amended abstracts of judgment, and to forward copies of the amended abstracts to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.

17